Good morning and welcome to the 9th Circuit. We are in a hybrid argument situation. Next month we are planning to go live with lawyers, as far as I know, but thank you for bearing with us. We will begin with the first case on the calendar, which is United States v. Mendoza. As usual, the attorneys on each side, I'm sorry, the appellant's attorney, can reserve time. We will not watch your time for you. And we are ready to begin, Mr. Ballo. Good morning, Your Honors. May it please the Court, Ethan Ballo on behalf of Henry Mendoza. Today we're going to be discussing both the sufficiency arguments and the instructional error. So I wanted to be clear at the outset how the Court addresses that evidence. With respect to the sufficiency challenge, the Court looks at the state of the evidence when the government rested, it evaluates the government's case and sees to determine whether Excuse me a minute. I find this somewhat garbled. Do you? I'm having trouble hearing the details of what you're saying. Is that better, Your Honor? Let me see. Go ahead, please. Go ahead, please. Yes. You've muted your phone, sir. You're still on mute because I can't hear anything. No, I can't hear anything either. You are on mute. You are on mute. You are on mute. Is that better, Your Honors? Yes. That is better. Thank you. I can't hear you and it is better. Thanks. Hello? No. That doesn't work. Let's try one more thing. Can anyone hear now? Yes. Yes. Oh, then I apologize, Your Honor. May I finish on the part of the Court to give you my minute 20 back? Can we go back to the beginning, please? Yeah. All right. I apologize, Your Honor. It's still Ethan Ballard for Henry Mendoza. What I wanted to say at the outset, Your Honors, is with respect to sufficiency challenges I'm going to discuss this morning. The standard is obviously you look at the government's evidence, not our evidence, to determine whether they made their case. With respect to the instructional errors that we challenged, you look at the totality evidence deduced at trial. And when we look at the evidence of what Henry Mendoza did with respect to the allegations, it's quite limited. What you have is there's a total of four telephone calls, one in May of 2013 and then one on June 1st and June 2nd, 2013, with his high school friend, David Guyton, who the government alleges is the right-hand man of the shot caller. And then nothing, there's no other evidence until April and May of 2016, three years later, when there's a series of texts with a man named Antoline. And then the only other evidence the Court can consider or was presented is the evidence of the officer observations of evidence seized and statements made with respect to a June 2nd, 2013 arrest and a December 2016 arrest five months after the breakdown. And this evidence does not provide this. The government's evidence does not support or not reflect that Mr. Mendoza, on any occasion, attempted to sell drugs to any person, didn't sell drugs to any person. And as the Court's aware, based on its work in Lennox, Loveland, and Ramirez, conspiracy to commit drug trafficking offense, what was alleged and what they had to prove is that he bought the methamphetamine to sell it down the road for the benefit of the organization. And there's absolutely no evidence of sales. There's no evidence of cutting agents. There's no indicia of sales. And we know that they searched his car twice. They searched his hotel when he was arrested. They see five telephones. I have one question. For the Rico conspiracy, does he have to sell drugs or does he have to intend to facilitate the conspiracy and know that somebody's going to sell drugs? Yes, so there has to be evidence that he made agreements to willfully participate in the affairs of the enterprise. What the allegation was here was that the manner by which he willfully participated, the evidence of that willful participation, was being a redistributor of drugs for Conor Rawner's organization. That was in the indictment, that that was how he participated? Yes, that is how he was charged in count one. That was the government's theory. It's how it was pleaded, presented, and argued to the jury. And now at this point, we look, was there evidence of that? And there wasn't evidence of that. Well, counsel, as I recall, the government did present expert testimony that the presence of multiple baggies is indicative of sales rather than personal use. It's certainly thin in comparison to many other Rico conspiracy cases, but now given the fact that we have to weigh the evidence in favor of the government, how do you respond to that evidence as being— I think the opinion evidence guides the jury and now guides your honors on how to view the evidence that was presented. And what you have to remember in this case is there was— there's one seizure that's—there's two drug seizures. There's June 2nd and December—June 2013, December 2016. December 2016 is the easy one. That was done three months after—five months after the takedown. There's no evidence that it was related to Conor Rawner's organization at all. So that cannot be drugs. We suggest, we argue, that the December 2016 evidence isn't evidence of anything on behalf of the CRO because the gang had been taken down, all the drug dealers had been taken down, and their expert witness on that gang, when he said what kind of criminal activity continued after the takedown, did not include—he excluded drug trafficking. So December 16 is right out, which brings us back to the June 2013 arrest, which you'll remember the jury rejected that he had any intent to distribute that. The jury found it was a personal use amount. Unless they put that aside— And the government's response to that is, well, fine, but you can have contradictory convictions. That doesn't matter. So, therefore, we— I'm not saying— Just a minute. So, therefore, we still look at all of the evidence, including the evidence of June— Correct. And that's why I'm going to pivot back to Judge Wynn's point. She's saying the expert says multiple baggies is indicative of drug sales. We have to look at the evidence of multiple baggies. He's got less than an eight ball that he's just purchased from Guyton, and he has 3.3 grams, some dribs and drabs of some Old Stash in his ankle. This isn't for sale. No reasonable juror can look at that mini bag and a new bag and say— the new bag he just picked up and say, those are for sales. And remember, if you look at Lennick, Ramirez, Loveland, we're talking about distribution quantities. We're talking about much more than an eight ball. And if you look at this case, which the evidence was introduced, Antoline—and he's having the same text, and we're going to 2016 now. This is April, May. He's buying two ounces at a time and selling them in eighth amounts. So that's how Skotorana sells drugs. The distributors, their sellers get big amounts, two ounces, and they sell them in eight balls. He's buying on June 2nd less than an eight ball. That is not evidence of—and that's not evidence of distribution. And here's the kicker, Judge Wynn. Even if it was, based on the expert, indicative of further distribution under Lennick, Ramirez, and Loveland, that still falls short in this case. They have facts show that he was redistributing for this group, not for himself. Could I interrupt you for just a second, Mr. Bala? Of course, Ron. You use a term that I'm not familiar with, which is eight ball. What is an eight ball? Is that eight grams? No, that's a very good question, Your Honor. Eight ball is approximately 3.5 grams of a substance. It comes from the notion that it's approximately one-eighth of an ounce. And so, basically, in the late 60s, it became colloquially known as an eight ball as a typical amount someone might buy or use. And so, my understanding is it originally came up in the cocaine trade. And obviously, because it's a measurement, it's now applied across narcotics. So, on the occasion when he was found with 16.2 grams, that was two eight balls? Nope. That was—he purchased an eight ball from Guy Tan. Actually, less than an eight ball. He purchased 14.2, and he had left over 3.3 grams of his own stuff that he owned prior to visiting Guy Tan to drop off a birthday present when he was with his daughter and his girl. And as we know, the jury rejected that with distribution. But I want to get back to the kicker point. Even if that supports the inference he would redistribute it, that's insufficient to prove that he would redistribute it for Guy Tan, that he was kicking back money. And the government continually says they're hounding him for taxes and payments. We have all four phone calls. None of them discuss debt or payment in any way whatsoever. And I would respectfully suggest, while the government speculates in this case, the most ready example of Loza and Guy Tan's—Loza's call to him on July 1st is he gets arrested when he leaves Guy Tan's with the drugs, and he disappears. And these guys are worried that he's snitching, and they can't find him. But in all the phone calls to him, all the messages to him, no one asks for money. No one says he has a debt. No one says he's dealing drugs for them. They all say, what's going on? Where you been? That's not evidence of redistribution for the trafficking organization. And then the Lennox, Ramirez, and Loveland, that's what they have to prove. If I can, can I pivot to, if you disagree with me on that, if you find that Jackson's standard is too hard, there's still an instructional error because he presented a buyer-seller defense, even though he termed it personal use, and the judge didn't give an instruction. And since this conviction, based on Lennox, Ramirez, and Loveland, this circuit has now changed the model instructions to direct that in the 846 case this instruction is supposed to be given. And out of all the cases that address the buyer-seller relationship, I commend I think the best job is Judge Kleinfeld's opinion in Loveland, which really lays out the holistic factors and how they get applied. And I also think it's certainly worth considering is Judge Hurwitz's concurrence in Moe, which forecast this case. When you have a defendant who's relying on a buyer-seller defense, it's not intuitive to understand that that is not, that unlawful act isn't enough to have conspiracy. That supporting the gang by being a customer isn't conspiracy for distribution under the law. And under these instructions, the jury was told if they believe he knew the drug the gang dealt drugs, which he certainly did as their customer, and he agreed to further their purpose, which included as a customer, because it said by committing any crime is charged in the indictment, and the verdict form told him simple possession was charged in the indictment, he was guilty. And it compelled that conclusion. And this is what Judge Hurwitz forecast in Moe, and this is what's required under the law. It was the jury did not have a chance to understand his defense, and under Bayer, Judge Anderson had a sua sponte responsibility to instruct the jury on the evidence presented at trial and the charges and defenses raised. You agree, Mr. Bally, you agree that the obligation to give the instruction was sua sponte because the defendant did not proffer such an instruction, correct? Yes, but I think it's still de novo review, and let me say two things on that. One, he asked for an LAO for conspiracy and furtherance of his defense, and that was poorly articulated. But we know that from Rodriguez, I can't give this side off the top of my head, the court evaluates the substance of the objection, and the substance of the instruction he sought was I can defend the case saying they believe that I only used the drugs or didn't sell them, but CRO, I win. And the jury never had a chance to resolve that very important fact that was the whole heart of this case. It went by then, and we don't know the answer. So I don't think, I think we get to de novo review, Your Honor, but I think the important question is if you don't agree with Rodriguez's application in this case, it's still plain error. Lennox, Loveland, Ramirez were on the books. We made a, at least a far more than a culpable case of actual innocence on August 29th. Well, if the obligation is to sue a spot to give the instruction, then it seems to be, if that's the way it's articulated in the cases, and it is, then is this whole issue somehow absolved from the plain error dichotomy, i.e. there is no obligation to raise it? Well, I think, I think that would establish that as plain error. And then the question is, was that error, did it affect the substantial rights, and should the court notice it? And I don't think it absolves the plain error test at all. It just gets to whether the error was clear and obvious. It's about judicial responsibility, the same way that the judge had a responsibility to answer the question for the RICO conspiracy differently, which I'll get to in a moment. And we think here, a properly instructed jury could have supported this defense. There's a reasonable probability of a different outcome. And this case, at best, for the government's good. I mean, this is a perhaps foolish question, but do you have any clue why the trial lawyer didn't ask for this? I mean, it seemed pretty, I mean, it seems hard to be plain when the trial lawyer, his lawyer, you know, should have asked for this, didn't ask for it. I know that's true in general. He asked for the substance of it, and Lennox, Loveland, and Ramirez compel it. The new model instructions prove it. And plain error is at the time of appellate review, not in real time. And so I'm sure if he had had the benefits of the new model instruction where this court verified everything I'm saying, Lennox, Ramirez, and Loveland holds, he would have asked for it. Before my clock runs, if I may, I just want to spend a couple of seconds saying that on the supplemental instruction error, the judge had a responsibility under Bohlenbach to clear away their confusion. The government confused the count on page one with, that said, that was about the knowledge element of conspiracy. And then compared that to count 45, which is the count 11 instruction on the law. And there was either two ways to answer this properly. One, to clear away the confusion, the judge said what I just said. The instruction on page 27 for count one is only about the knowledge element. The conspiracy instructions have more than just knowledge. Two, if he wanted to get deeper, he could have said, well, the instructions 21 to 25 are about conspiracy. The count one instructions may be found at 21 to 35 and 37 to 44. And the count 11 instructions may be found at 38 and 45 to 46. Can you tell me what specifically would have been different? The distinction is whether in the RICO instruction he had to do more than know what was going to happen and whether he had to intend to forward the conspiracy. That is correct. And worse than that, what he told the jury, that's correct, Your Honor, absolutely. But then worse, he told the jury that the instructions on page 21 to 25 were background and description. That's wrong. Instruction one said what they actually were, instructions of law that the jury must follow and apply. And two, they cannot pull out or emphasize one instruction over any other. They must harmonize them. So even putting beside the Bolenbach error of failing to put aside to clarify the confusion, what he told them was clearly wrong. The instructions on 21 to 25 were neither background nor description. The instructions on 21 to 25 were the general conspiracy instructions or what were they? Correct. Correct. They were the general and jury instructions. And he watered down their emphasis and he stopped them from focusing on the act of participation by telling the jury to focus on 27 as the specific for RICO and 45 as the specific for count 11. And that's wrong as a matter of law. So, again, even under plain error of view, that was an improper instruction and it still fell short of Bolenbach. Unless the court has questions, I know the government's going to have things to say. I'd love to reserve as much time as I can. Fine. Thank you. Your Honor. Yes. Good morning, Your Honors. May it please the court. Lindsay Bailey on behalf of the United States. I'm going to begin by addressing the sufficiency argument. And the court should affirm defendant's convictions because the evidence at trial reasonably established the defendant was a long-time Contouranus or CR gang member who continued to get gang tattoos and reference gang signs and symbols well into 2016. Who was fronted distribution quantities of methamphetamine on multiple occasions. Can I? While in excess. Yes. And ask the same question I asked Mr. Balow. Is it correct that as instructed or there's no dispute that in this case he did have to himself have sold drugs for distribution to be convicted of the Rico conspiracy? Is that right? I don't believe that he had to have, but that's certainly what the government argued. That this individual particularly was a foot soldier who primarily sold drugs on behalf of the gang. I don't believe legally. It was required that he do so. The government's theory is a twofold inquiry in order for this case to survive a sufficiency. The evidence would be one is that there was evidence of redistribution, but also that it was on behalf of the gang in particular. Correct. That's correct, Your Honor. And the government's position is that there was significant evidence that defendant was a member of the gang and was selling drugs in furtherance of that gang. He stated that he was jumped into the gang when he was a teenager. There was expert testimony that once an individual is jumped into the gang that they become members for life. That an individual can certainly have less responsibility as they grow older but never age out of the gang. That if an individual drops out, they become greenlit or they would therefore be subject to assault or even possibly murder on site. And yet defendant maintained positive and cordial relationships with gang leadership including David Gaitan, Jose Loza, and Leonardo Antlin. Ms. Bailey, is that all perfectly consistent with him being a customer, a buyer of drugs from the gang? And where is the evidence that he did anything such as selling drugs for the gang or delivering money from sales to the gang? Your Honor, it's actually not consistent with him being a simple customer. The mere fact that he is a member of this gang and is getting gang tattoos in furtherance of the gang, showing his loyalty and support for the gang, all is indicative that he's more than just a mere customer. He's actually a knowing and voluntary participant. And in fact, there was evidence at trial that… But you seem to agree that he had to be a particular kind of knowing participant. Maybe he's doing something else for the gang. But on the government's theory, he had to actually be selling or distributing drugs for the gang. So the fact that he's a member of the gang, even if he is still a member of the gang, although he says he isn't, doesn't meet your burden of proof. Yes, Your Honor. But there was also, again, significant evidence that he was selling on behalf of the gang. Again, the fact that he… To address the court's previous question about the amount that he had on June 2, 2013, yes, an eight ball is approximately 3.5 grams. And this defendant, in fact, had 16 grams in his possession, so about four eight balls, which is a significant amount. There was also indication that the amount that he was fronted was significant and that half a gram, I believe, is significant, constitutes a personal use amount. Defendant himself also… I'm sorry. I thought half a gram was a personal use amount for one day, maybe, by somebody who's… but maybe more. That's correct. The government's expert basically testified that a single use amount was approximately half of a sugar packet, and this was significantly more than that. It was also extremely pure methamphetamine that was fronted to the defendant without any expectation of payment at the time. Is it your position that a user and a buyer only buys the amount that he needs that day? There was, in fact, testimony to that effect, Your Honor, that one of the experts testified that buying in bulk is not actually very common because somebody can get robbed. Could you prove something beyond a reasonable doubt by having an expert saying something isn't common? Does that prove it didn't happen? No, but again, this court needs to view all of the evidence collectively in the light most favorable to the government. While Defense Counsel has indicated that there possibly may be reasonable expectations for every individual situation, when viewed as a whole, there's certainly sufficient evidence to find that the defendant was, in fact, a drug dealer. The hard part of this case is that we know that the jury didn't believe it because he didn't convict him of possession with intent to distribute. So I understand that, but, well, it was simple possession with regard to the June amount. So I understand that there can nonetheless be sufficient evidence in a different count, but it's pretty hard to wrap your head around the fact that we're supposed to believe something that we know the jury didn't believe. We're supposed to say they could have believed something that we know they didn't believe. Well, Your Honor, under Powell, this court should actually view the acquittal in not necessarily the light that the jury didn't believe it because we do not actually know why the jury acquitted on count 13. And under Powell, this court should actually view that as possibly a mistake or lenity as opposed to concrete proof that the jury didn't believe the government's version of the law. But why doesn't that lead to the buy or sell instruction then? I mean, the most sensible explanation of how they could do both is because they didn't understand the buy or sell point. Yeah, I can turn to that, Your Honor. And really quickly, I would like to address, just because the court brought it up earlier, the standard of review. Here, again, the government's position is that it is a plain error review. The instructions that a defendant requested at trial in no way tracked the buy or sell rule. He specifically asked for a lesser-included instruction of a conspiracy to possess, and a conspiracy to possess is not necessarily a buy or sell rule request. And so since he never actually requested this particular instruction, this court would review for plain error. And again, the failure to instruct on a defense the defendant actually relied on at trial is only error if the other instructions given to the jury considered in their entirety fail to cover the defense's theory. And here, the defense's theory was adequately covered in all of the other instructions that were provided by this court. Where? Tell us specifically where. Yes, of course. There was – may I have a moment, Your Honor? Yes, but if we could go through it, it would be helpful, because I don't see it off the top. Well, I apologize, Your Honor. I don't have it in front of me, but there was essentially indications throughout the jury instructions. The defendant had to be a knowing and willing participant in order in the conspiracy that he had to agree that multiple individuals, two or more individuals, would be involved in the racketeering enterprise. He had to join the agreement knowing of its purpose and intending to help accomplish it. And indeed, the instructions here were remarkably similar to the instructions in Moe in which this court held that there was no error for failure to provide the buyer-seller instructions. This is why I keep harping on the fact that on the government's theory, intending to forward the conspiracy by some means other than selling would not have been sufficient. So, selling or distributing. So, all of that doesn't go to the point. So, what does go to the point? I'm sorry. I don't think I understand the question. What you have so far quoted does not go to the question of whether buying alone is an act in furtherance of the conspiracy. Well, Your Honor, I think one of the things that we should also view is how this case was actually argued to the jury. And there was never any point in any of the trial, really, where anyone argued that the defendant could be a member of the conspiracy by being a mere customer. And there weren't any other situations where other individuals were identified as being members of the conspiracy as mere customers. Rather, the government argued— But, as I say, or selling. But we know that the jury didn't believe that with regard to the December — the June incident, June 2013 incident, which makes it very important to know what — how they — I mean, the fact that they did that suggests that there was something that caused them, nonetheless, to conclude that he was in the government. The conspiracy and the most likely explanation is they thought that what they did know about him, that is, that he bought drugs, was enough. Your Honor, I would respectfully disagree on two counts. First, again, I don't think that we can presume that the jury did buy the defendant's argument and that that was the reason for their acquittal. Again, I think under Powell, this Court should assume that the jury acquitted due to lenity or mistake. Second, I think that there's also, other than that June incident, there is significant evidence the defendant was a member of the drug trafficking conspiracy. And particularly— I think, Ms. Bailey, we're trying to drill down on that to figure out whether there's sufficient evidence or not. You mentioned fronting. Am I correct that that occurred only in the June transaction? There's no other evidence of fronting, no pattern of behavior that the government is relying on? So, the only direct evidence of fronting, yes, was from that June incident. However, there was no indication that the defendant otherwise paid for the drugs that he received from Leonardo Anselin or the drugs that he received on December 8. Would you mind going a little bit slower, Ms. Bailey? Apologize, Your Honor. I'm having difficulty understanding what you're saying. Now, in answer to Judge Nguyen's question, what is the evidence that this man was in any way buying more than he was using? So, for example, during his own testimony, defendant stated that the amount that he purchased or received on June 2nd was enough to last him for the entire month. And that was approximately 16 grams of drugs. And yet, in the text messages between himself and Leonardo Anselin, defendant requested significantly more than that. And, in fact, approximately an ounce and a half, which is significantly more than that over the course of three weeks. So, even giving credit to defendant's testimony that he would use a full 16 ounces over the course of a month, even giving credit to his testimony that he would buy in bulk and that he received drugs fronted from gang leadership with no expectation of payment just because he was friends, the text messages between himself and Leonardo Anselin show that he was purchasing, or at least receiving, significantly more than his own personal use quantities directly from Leonardo Anselin, who there was significant testimony at trial that he was a high-level gang member. And, indeed, defendant requested these drugs while simultaneously referencing CR gang signs and symbols. He said things such as Frog Gang. Ms. Bailey, would you kindly point to the evidence where Mr. Mendoza tried to buy more than his monthly supply, the 16.2 grams? Yes, Your Honor. It is in the excerpts of record, pages 7. I believe it is volume. I'll let you know the volume in a second. But it's pages 765 to 768. And how much did he try to buy? Over the course of approximately three weeks, he solicited approximately half an ounce of methamphetamine three times. So, that was an ounce and a half. But, wait, he didn't get it, though. So, he was soliciting. There's no evidence to show whether he actually received it or not. But there's no evidence that he did get it. So, there's no evidence that he actually was trying to get more. The evidence is he asked for it earlier, but we have no reason to think he got it earlier. Well, again, Your Honor, the way that the text messages read is not following up on this request or I wanted to check in back again. It's three separate times, three separate conversations, three separate requests for drugs. Counsel, I'm looking at 765. I'm sorry. What text are you referring to that shows an attempt to solicit that quantity? Of course. So, if you look, the text messages are numbered on the left-hand side. One of them is numbered 2791. There's an indication that says, Where are you at? I need half O. That indicates that it's to Leonardo Anslin, and these text messages are from the defendant's phone. Half an O, and there was testimony from an expert that half an O references half an ounce of methamphetamine. Similarly, on page 7, starting on page 767, looking at message 767, defendant starts by asking in need of a quarter, referencing quarter ounce, and then later states, Shoot me a half for 150 in message 747. And then there is, on page 767, page 1023, there's a message that says, Just trying to get more D, referencing drugs. And considering the fact the defendant previously requested and subsequently requested half an ounce, it's a reasonable assumption for the jury to make that the defendant was similarly requesting quantities of half an ounce at that time. But even if he wasn't, a full ounce is still well over his normal personal use quantities. So unless the court has any questions, I would like to use the last of my time just to briefly reference the supplemental instruction. Let me ask you a question, Ms. Bailey. Half an ounce is how many grams? Half an ounce. I have to do some quick math. I apologize, Your Honor. I believe it's about 14 grams. How many? About what? 14. 14. So about what he had in his possession on June 2nd. So that would be less than what he testified was his monthly usage when he had 16.2. It would be approximately the same as what he said was his monthly usage. Right. He's requesting it three separate times. So when did he have the 16.2? What was the date? June 2nd, 2013. Which date? June 2nd, 2013. And this half an ounce was in April, right? So it was two months before? No, this is actually in 2016. This is a number of years later. So is your position that asking for half an ounce indicates that he was selling? Yes, Your Honor. The fact that he at this point is requesting approximately three times his own admitted personal use amount is indicative that he is in fact selling on behalf of the gang. I would prefer, if you're going to go on to something else, that you go on to the buyer-seller instruction. Absolutely, Your Honor. So, again, I think I already explained why the government believes that this is a plain error review. And, again, the facts of this case are remarkably similar to Moe. Well, they're not similar because he was convicted of possession, which is what the footnote in Moe says might be different. And your only explanation as to that, and I would think it would be different, and you say, well, that was a lesser-included offense. It wasn't the way the case was charged. Why does that matter? It still went to the jury that way. So two things, Your Honor. The first is that the jury instruction specifically made clear what charges were actually in the indictment, and the lesser-included of simple possession was now listed as being a charge of the indictment. But why does that matter? Why does it matter? Well, I mean, they said the indictment, but what really matters is what went to the jury. What went to the jury was a simple possession charge, and that's what they found, in fact. Well, ultimately, Your Honor, I believe that Moe suggests that a fire seller instruction may be necessary or might be necessary if there's a possibility of some confusion that the jury may think that the charge of simple possession is a way to further the conspiracy. And I don't believe that was the case here. Here, there was no indication, again, by either the government's argument or by the jury instructions, that simple possession was a charge in the indictment. Neither David Gaetan nor Leonardo Antolin were separately charged with sales to the defendant, nor was there any evidence that they were separately charged with sales to the defendant. And so it doesn't really fall within the specific footnote contemplated by Moe. But even if it did, again, Moe simply indicates that jury instruction might be necessary in this case. And here, since we're reviewing under plain error, any error that's subject to reasonable dispute is not so clear and obvious that it would be plain error. And here, there's no controlling authority in which this Court has found that it is plain error to fail to include a fire seller instruction. I gather that almost every other circuit has held that it's mandatory, essentially. In fact, in the Moe court, I believe in that same footnote, the court recognized a circuit split, in that the Sixth Circuit finds that it's never required, whereas the Seventh Circuit finds that it is required. And here, the court essentially decided to take it on a case-by-case basis. So, again— Again, what disturbs me the most is that we have pretty good reason here to think that they were confused. I understand you keep saying, well, it could be something else. But the most logical explanation for what they did is that they were confused about exactly this point. Your Honor, again, I believe that the evidence in this case is unlikely to lead to the confusion suggested by defense counsel. The evidence was that defendant repeatedly engaged in drug sales on multiple occasions on behalf of the CRO. What were the multiple occasions other than June 13th? So, the June occasion, the one that we just discussed, the May text messages between himself and Leonardo Antolin, and then, again, the December 8th incidents in which he had multiple packages of methamphetamine prepackaged and ready for distribution. Is there an indication that he purchased that from the gang? Was that after the arrest in this case? It was after a significant number of arrests. However, there was testimony that approximately 50 of the 140 members had been arrested. There was expert testimony that CR gang members are expected to fund the activities of their incarcerated members. He was literally, I think, on the border of CR territory. And there was testimony that an individual would not be allowed to individually sell methamphetamine for his own personal use in CR territory without permission of the gang's leadership. He wasn't in CR territory. I don't know where he got the amount that he was arrested with in December. The case had already gone overt, right? The arrests had been made. He got arrested with that, I think, two or three baggies. But where's the evidence that he purchased that from the gang? Because I thought that at one instance, there was some indication that he was negotiating price and expressed a willingness to buy from non-gang members or maybe others. I don't believe that there was ever any evidence at trial that he expressed a willingness to buy from non-gang members. I thought at one point he said, if you don't get me this by 1 o'clock, I'm going to go get it from somebody else. We don't know who that other individual was, though. DeFace was never identified either in the investigation or afterwards. But doesn't that suggest that he was going to get it from a different gang or somebody who's not affiliated with this gang? So that evidence of negotiating for price and also willingness to buy from other sellers, isn't that unusual for somebody who's selling drugs on behalf of this particular gang? No, Your Honor. And again, I believe that the fact that he referred to this individual by their moniker, DeFace, actually indicates that it was someone within the gang itself that both he and Mr. Antlin would be familiar with. If it was someone outside of the gang referring to that individual by their moniker— Is there any evidence that DeFace was a member of the gang? We don't—DeFace was never identified, but I think that it's a reasonable inference to determine that because they were referring to this individual by their moniker between himself and Leonardo Antlin, that it could have been someone else within the gang that was simply not identified. Okay, your time is up, so thank you very much. Thank you, Your Honors. I appreciate your time. Thank you. Mr. Bailu, you have five minutes. No, no, you're— You're on mute. You're on mute again. You're on mute again. Thank you, Your Honors. That's going to be the anthem of the pandemic when it's all over. You're on mute, so go ahead. I don't think I'm going to run through all my time. I have just a couple of quick points. It's plain that you, Your Honors, have dug deep into the case and understand it. One, I'll begin by correcting myself. Judge Bailu, you were right. I gave the right amount of grams with respect to June 2nd arrest. Sixteen point two grams is a little more than half an ounce. As Judge Ilston will tell you if you've ever asked her, I am terrible at math. So I got the amount right, but that's about a half an ounce, and the rest of the Court's comments on that make sure clearly they understand that evidence. Two, the government's argument we just heard breaks down to he was in a gang for life. That means he's guilty of RICO. The case law is—this Court's case law is replete with cases that say gang membership isn't a crime. They're arguing that's what makes this a crime. No, what makes this a crime or not is whether there was evidence for redistribution on behalf of the gang. We know there's not. Three, when you asked the government for its evidence of sales, they focused on his testimony, which is why I opened with we don't get there. Rule 29 ends with the government's case. His testimony cannot affect Rule 29. Rule 29 is based on the evidence they presented. They failed by their own admission today. Relatedly, the only evidence of fronting of June 2nd wasn't coming from the government. It came from Mr. Mendoza when he admitted he had a debt. Not that it was fronting. It was a debt because he was friends with these guys from childhood. He didn't say it was fronting for the gang, and you can't take an exculpatory statement. I bought this for personal use for my buddy and say that's a confession that he was selling for the CRO. That is— What about the sort of complicated evidence about the fact that he asked for a fairly large amount within three weeks, including the larger amount when he was negotiating? There's no evidence. I think the example we gave was when I was trying to get my COVID vaccine, I called every day for seven days in a row. I wasn't trying to get seven COVID vaccines. I was trying to get the vaccine I needed, at least the first dosage. Calling Anthony repeatedly and negotiating with him, and you can't show the amount, lesser than Rubio, negotiation, here's what I'm willing to pay. Oh, for that price, I want more for the discount. That's not consistent with being a foot soldier, taking orders, being fronted. There's no evidence of fronting or discussion of fronting. So that's how I would deal with that evidence. Those two text messages, one shows what a dealer relationship looks like, one looks like a customer relationship. Relatedly, there's no phones. They can't contact him. Foot soldiers have to get—be sort of instructed. In this case, there was 21,000 calls recorded. We have three that don't cover any of these subject matters. My two short points, last points, is the verdict form clearly says that Simple Possession was charged in the indictment, and that's what the jury was told. It doesn't matter whether it was actually charged that day. The jury was told it was charged that day, and that's why Mo applies in the way we say. And the last thing I want to talk about is the surfeit of evidence. Government's theory, bless you, Your Honor, is that this guy sold on the streets from May of 2013 to December of 2016. He was a street-level dealer except for his year in the can. There was never any kites found when he was in the can, no activity in the can, and though he was more than almost four years on the streets, not one police officer noticed him, took a photograph of him, saw any of his activity while they were taking down this gang. That is unreasonable. He's an invisible man without a cell phone who's somehow selling drugs, and that's why there's no evidence of drugs, because he didn't sell drugs. And one of the things Judge Anderson blocked the jury from hearing is his arrests during this time period are all the same, 11-377, 11-550, under the influence, Simple Possession. Even the cops on the street knew who he was, a drug-addled guy who needed treatment or, in some circumstances, prosecution, but he wasn't a drug dealer. I thank the court for its time. The last thing I'll say, I think the 924 sees out as a matter of law based on Davis as a predicate offense. The government cites Dominguez. I know Judge Wynne dissented and Dominguez is on a different ground, but Dominguez doesn't address this point. What Leary and Fulbright say is if a statute's unconstitutional and it was a basis for conviction, if there was two options and one's unconstitutional, it's a retrial. What Dominguez says is when we're doing an assessment on review of a case under the categorical approach, if one of the bases is unsound but one is sound and we only need one, then that enhancement can occur. It's apples and oranges. And with that, I'd ask the court to enter judgment of acquittal on all counts. Otherwise, I'd ask you to reverse the convictions and remand for a new trial. Okay. Thank you very much. I thank both of you for your argument in this complex case. The case of United States v. Mendoza is submitted.
judges: BERZON, BEA, NGUYEN